FILED
United States Court of Appeals
Tenth Circuit

December 15, 2010

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

     Plaintiff-Appellee,

v.

ARNOLD ZALER,

     Defendant-Appellant.

No. 09-1521
(D.Ct. No. 1:08-CR-00089-JLK-1)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]

Before **MURPHY**, **BALDOCK**, and **BRORBY**, Circuit Judges.

After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

Appellant Arnold Zaler pled guilty to one count of wire fraud in violation of 18 U.S.C. § 1343, two counts of bank fraud in violation of 18 U.S.C.

_____

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, *res judicata* and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

§ 1344(2), and one count of mail fraud in violation of 18 U.S.C. § 1341. Mr. Zaler appeals his fifteen-year concurrent sentences which the district court imposed following its decision not to apply the advisory United States Sentencing Guidelines ("Guidelines" or "U.S.S.G."). The district court determined application of the Guidelines would produce sentences less than necessary to achieve the purposes of the sentencing factors in 18 U.S.C. § 3553(a). We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm Mr. Zaler's sentences.

## I. Background

For the purposes of this appeal, we find it unnecessary to recount in full detail the fraudulent conduct involved in this case other than to provide a general account of the financial schemes perpetrated by Mr. Zaler, as set forth in the stipulated facts contained in his plea agreement and the unobjected-to facts provided in the presentence report.

To begin, Mr. Zaler owned and operated Zaler's Kosher Meats (Kosher Meats), a company selling kosher hot dogs and other food products in Denver, Colorado. In the Fall of 2005, he arranged with Kroenke Sports Enterprises (Kroenke) to operate a single concession stand at the Pepsi Center, a professional sports and entertainment facility in Denver, Colorado. Similarly, he contracted

with another entity to operate a single hot dog concession, known as Kosher Korner, LLC, at Invesco Field, the stadium for the Denver Broncos football team. It is during these ventures Mr. Zaler fraudulently obtained loans from various individuals and entities by making false representations and using fake purchase orders to convince them he had outstanding accounts receivable for hot dogs from which he would repay the loans.

## A. Fraudulent Misrepresentations and Conduct

### 1. Fraud Against MEP Group
#### (Wire Fraud Count)

On October 17, 2005, Mr. Zaler obtained a loan for $181,000 plus interest from MEP Group based on his false representation Kroenke ordered 241,000 hot dogs from his business, Kosher Meats, and his presentation of a fake purchase order indicating Kroenke would pay $771,200 for purchase of those hot dogs. When Mr. Zaler failed to repay the loan on schedule and MEP Group requested payment assurances from Kroenke, Mr. Zaler arranged for Ryan Smith, his contact at Kroenke, to meet with one of MEP Group's principals. At Mr. Zaler's behest, Mr. Smith falsely represented Kroenke owed Kosher Meats $771,200 for the purchase order in question and would pay Mr. Zaler on April 3, 2006. Later, Mr. Zaler signed a document fraudulently representing to MEP Group that Kroenke owed his business $771,200 and Mr. Zaler would satisfy his obligation

with MEP Group after receiving payment from Kroenke. On April 4, 2006, Mr. Zaler repaid MEP Group $306,764.25 from monies obtained through a loan from Spivak Funding (Spivak), as discussed hereafter. After receiving the payment, MEP Group agreed to advance Mr. Zaler's business more money.

In June 2006, Mr. Zaler provided MEP Group another false and fraudulent Kroenke purchase order signed by Mr. Smith showing Kroenke ordered 150,000 hot dogs from Kosher Meats for $480,000. As a result, MEP Group caused its bank to wire transfer $228,000 to Kosher Meats' account at another bank. Similarly, on August 2, 2006, MEP Group made a third loan to Kosher Meats for $150,000 through a bank wire transfer based on Mr. Zaler's misrepresentation he had an order for 98,100 hot dogs from Centerplate, a company operating concession stands at Invesco Field. As part of the same scheme, Mr. Zaler also provided a fake Centerplate purchase order containing the forged signature of a Centerplate employee which falsely showed Centerplate owed more than $300,000 to Kosher Meats. In early 2007, when Mr. Zaler failed to repay these loans, MEP Group threatened to sue him, after which he signed a repayment agreement; however, Mr. Zaler only made one payment of $100,000 after executing the agreement.

## 2. Fraud Against Spivak
### (First Bank Fraud Count)

On February 23, 2006, while Mr. Zaler was defrauding MEP Group, he obtained the aforementioned loan from Spivak by showing the owner two fake Kroenke purchases orders, including the previously-mentioned $771,200 purchase order for 241,000 hot dogs and another for $506,918.40 for 158,400 hot dogs–both with the forged signature of Kroenke's vice-president. On March 2, 2006, Mr. Zaler arranged for the owner of Spivak to meet with Mr. Smith, who, again, at the direction of Mr. Zaler, misrepresented the authenticity of the purchase orders and stated Kroenke intended to buy more hot dogs from Kosher Meats. Mr. Smith also signed a document falsely representing the authenticity of the purchase orders and agreeing that, in the event of a dispute between Kroenke and Kosher Meats, Kroenke would pay all outstanding invoices "factored by Spivak."

Thereafter, Mr. Zaler and Spivak entered into a "Factoring Agreement" in which Kosher Meats, through Mr. Zaler, assigned its Kroenke accounts receivable to Spivak in exchange for loans, even though the accounts receivable did not exist. With the help of Mr. Smith, from March 2006 through June 2006, Mr. Zaler sent Spivak eight sets of false and fraudulent documents relating to Kroenke purchase orders for hot dogs from Kosher Meats. These sets of documents

included letters signed by Mr. Smith falsely stating Kroenke received the specified hot dogs from Kosher Meats. On receipt of each set of documents, Spivak directed its bank to make interbank transfers from its bank account into the bank account of Kosher Meats.

In addition to the Kroenke fraudulent purchase orders, Spivak transferred additional funds to Kosher Meats' account based on two other fake purchase orders prepared by Mr. Zaler. The first falsely represented Coors Field–the stadium of the Colorado Rockies baseball team–ordered hot dogs from Kosher Meats, and the other similarly misrepresented Centerplate at Invesco Field ordered hot dogs from Kosher Meats.

After Mr. Zaler failed to pay back the loans and Spivak contacted Mr. Smith for payment from Kroenke, Mr. Smith again made false representations at Mr. Zaler's direction stating the money would be forthcoming. When Spivak did not receive payment from Kroenke, it contacted Mr. Zaler, who provided a $100,000 payment and made multiple additional false representations concerning Kroenke's alleged failure to pay the money due his company. Finally, on August 18, 2006, a Spivak representative contacted Kroenke's general counsel and learned Kroenke never purchased hot dogs from Kosher Meats. On the same day, Mr. Zaler returned to Spivak the $188,352 he received from it as a result of the

fake purchase order for hot dogs at Invesco Field.

### 3. Fraud Against Skupsky
### (Second Bank Fraud Count)

In August 2006, Mr. Zaler commenced yet another fraudulent scheme when he contacted Donald Skupsky about funding his single hot dog concession stand at Invesco Field. After Mr. Skupsky agreed to invest, they created Kosher Korner, to which Mr. Zaler assigned his Invesco Field concession stand contract. Mr. Zaler then provided Mr. Skupsky with a fake purchase order for hot dogs in the amount of $313,920 with the forged signature of Steve Hall, a representative of Centerplate. Based on this purchase order, between September 15, 2006, and January 31, 2007, Mr. Skupsky made a series of loans by interbank transfer from his account to the Kosher Korner account totaling $142,500. Meanwhile, in December 2006, Mr. Zaler contacted Mr. Hall and asked him to create a false document stating the fake Centerplate purchase order would be paid soon. Instead, Mr. Hall contacted an FBI agent.

### 4. Fraud Against Perlmutter
### (Mail Fraud Count)

Between November 8, 2006, and February 8, 2007, while Mr. Zaler conducted the aforementioned fraud schemes, he obtained three loans from a Denver businessman, Jordan Perlmutter, in the amount of $323,000. Thereafter,

between March 9, 2007, and June 4, 2007, Mr. Zaler provided Mr. Perlmutter three personal checks for repayment of the loans, but all three checks were returned for insufficient funds. In September 2007, Mr. Zaler misrepresented to Mr. Perlmutter that his company contracted with Centerplate for the purchase of $320,000 worth of hot dogs and that Super Target stores also owed his business, Kosher Korner, $310,000 for hot dogs. Based on these false representations, Mr. Perlmutter entered into an agreement and irrevocable assignment with Mr. Zaler, in which Mr. Zaler misrepresented these companies owed him money and assigned $300,000 of the fake accounts receivable to Mr. Perlmutter.

On September 7, 2007, Mr. Perlmutter's attorney sent, by FedEx, the agreement and irrevocable assignment to Centerplate and a Super Target store. Three days later, Mr. Zaler went to the Centerplate office, told a Centerplate employee his attorney mistakenly sent Centerplate a package, and asked her to retrieve the package without anyone seeing it. Apparently, no package was retrieved, causing Mr. Zaler to call the same employee three times that day and then approach her outside the Centerplate office, asking again about the FedEx package and offering her tickets to a sporting event if she helped him retrieve the package. The package arrived at Centerplate the next day, at which time the employee gave it to her supervisor, who delivered it to the FBI.

-8-

## B. Fugitive Flight and False Representations

On February 25, 2008, a thirty-count indictment issued against Mr. Zaler, charging him with mail, bank, and wire fraud. On March 11, 2008, in conjunction with a summons, Mr. Zaler appeared in district court, at which time a magistrate judge released him on certain conditions, including he surrender "any passport or other international travel documents to the clerk of the court immediately upon release" and not leave Colorado except with the court's permission. The same day, Mr. Zaler surrendered his United States passport and a temporary Israeli travel document; however, he failed to surrender another Israeli travel document previously issued to him. Following his arraignment, Mr. Zaler left Colorado, traveled to Atlanta, and then flew to Israel. A few weeks later, he contacted his probation officer in Denver, pretending to be in Colorado and indicating his intent to go to Telluride, Colorado; he called again four days later, explaining he could not travel back to Denver due to a snowstorm. Almost a year later, on February 20, 2009, Mr. Zaler voluntarily returned to the United States.

## C. Guilty Plea and Plea Agreement

On July 24, 2009, Mr. Zaler pled guilty to one count of wire fraud in violation of 18 U.S.C. § 1343, two counts of bank fraud in violation of 18 U.S.C. § 1344(2), and one count of mail fraud in violation of 18 U.S.C. § 1341. As part of the plea agreement, Mr. Zaler stipulated to the foregoing facts and also

acknowledged his understanding the maximum statutory penalty for violation of §§ 1341 and 1343 was not more than twenty years and the maximum statutory penalty for violation of § 1344(2) was not more than thirty years. The parties also agreed any estimate of the advisory Guidelines range did not preclude departure for aggravating or mitigating circumstances and that the court could impose any sentence up to the statutory maximum, regardless of any Guidelines range computation.

The plea agreement also reflected the parties' disagreement on the losses Mr. Zaler caused victims for the purpose of calculating an increase in his offense level under U.S.S.G. § 2B1.1(b)(1). The government calculated the loss in excess of $2,500,000, for an increase of eighteen levels, while Mr. Zaler calculated it at $2,215,808.97, for an increase of sixteen levels.[1] Using its loss calculation to assess the total offense level, the government calculated the Guidelines range at seventy-eight to ninety-seven months but noted it "could conceivably result in an advisory guidelines range from sixty-three months ... to 150 months," depending on a final criminal history category. In turn, using his loss calculation, Mr. Zaler

---

[1] U.S.S.G. § 2B1.1(b)(1) provides a scale to calculate the offense level increase based on the amount of monetary loss caused to victims; under § 2B1.1(b)(1)(I), the offense level increase is sixteen if the total loss is more than $1,000,000 but less than $2,500,000, while § 2B1.1(b)(1)(J) provides for an increase of eighteen levels if the loss is more than $2,500,000 but less than $7,000,000.

estimated his Guidelines range at sixty-three to seventy-eight months but noted it "could conceivably result in an advisory guidelines range from fifty-one months ... to 125 months," depending on his final criminal history category. Both parties agreed, however, "[t]he sentence would be limited, in any case, by the statutory maximum." While the parties disagreed over the loss calculation, they agreed the restitution amount should be $2,664,573.22. At his plea hearing, Mr. Zaler acknowledged his understanding of the maximum statutory penalties and admitted no one guaranteed or promised him a specific length of sentence within the statutory limit. In addition, his counsel reminded the district court of the parties' disagreement over the § 2B1.1(b)(1) loss calculation.

## D. Presentence Report

Prior to sentencing, a probation officer prepared a presentence report, reiterating the applicable maximum statutory sentences were twenty and thirty years and using the 2008 Guidelines to calculate Mr. Zaler's total offense level and criminal history category. In assessing Mr. Zaler's criminal history, the probation officer noted, in part, the following: (1) in 1995, he pled guilty and received two felony convictions in Colorado for "theft" and "fraud by check" for which he received a two-year deferred sentence on the theft count, a two- to six-month sentence on the fraud count, and an order of restitution for $11,000; (2) in 1997, he pled guilty and received a felony conviction in Arizona for "fraudulent

-11-

schemes and artifice" involving the sale of Phoenix Suns and Cardinals season and playoff tickets to various victims, for which he received a five-year sentence and was ordered to pay restitution in the amount of $29,740, of which he paid none; (3) in 1997, he received a felony conviction in Arizona for "fraud schemes" concerning a scheme similar to the instant one in which he used his computer software company to defraud investors of millions of dollars based on fake purchase orders for computer software and a forged letter from a United States Senator's office indicating he had been approved for a small business loan in the amount of $1,250,000; he received a sentence of twelve years, of which he served only five years, and was ordered to pay $982,541.19 in restitution, of which he paid only $1,480; according to his probation officer at that time, Mr. Zaler attributed his conduct to a bipolar disorder, his ego, and a fear of failure; and (4) in 1997, he received a felony conviction in Arizona for "theft" after defrauding a bank out of $153,275.33 and another individual out of $41,000, for which he received a thirty-month sentence and was ordered to pay $138,275.33 in restitution, of which he paid none.

On the basis of his criminal record, the probation officer calculated Mr. Zaler's criminal history category at III but noted it might warrant an upward departure of one level given its under-representation, stating:

In light of the pattern of fraud activity in which the defendant has

engaged since 1995 and the nature of that conduct, it appears that criminal history category IV may more appropriately represent both the seriousness of the defendant's criminal history and the likelihood that the defendant will commit other crimes.

In determining his total offense level, the probation officer determined it would be twenty-six if the government's estimated loss of more than $2,500,000 was used in conjunction with U.S.S.G. § 2B1.1(b)(1)(J), which, combined with his criminal history category of III, resulted in an advisory Guidelines range of seventy-eight to ninety-seven months imprisonment. Thus, if the recommended one-level upward departure, using a criminal history category of IV, was applied to the government's offense level calculation, the Guidelines range would be ninety-two to 115 months imprisonment. *See* U.S.S.G., Ch. 5, Pt. A (Sent'g Tbl.). Alternatively, the probation officer determined the total offense level would be twenty-four if Mr. Zaler's estimated loss of less than $2,500,000 was used in conjunction with § 2B1.1(b)(1)(I), which, combined with a criminal history category of III, resulted in an advisory Guidelines range of sixty-three to seventy-eight months imprisonment.

In addition, the probation officer exhaustively presented aspects of Mr. Zaler's history and characteristics in conjunction with the § 3553(a) factors, including an account of: (1) Mr. Zaler's contention, as well as a psychiatrist's

-13-

report, he suffers from manic behavior and bipolar disorder; (2) his failure to voluntarily seek treatment or receive treatment for such a condition while incarcerated; (3) some of his family members' impressions he committed the instant crimes based on his ego and fear of failure, rather than for malicious reasons; and (4) his past charitable work with various Jewish, political, and other organizations. The probation officer also noted Mr. Smith, who obtained no monies as a result of Mr. Zaler's fraud schemes but acted out of friendship,[2] lost his job with Kroenke, pled guilty to one count of fraud, and was ordered to pay $1,886,574.82 in restitution to Spivak Funding and $128,000 to MEP Group, payable jointly and severally with Mr. Zaler.

The probation officer also provided information from Mr. Zaler's girlfriend who explained he financially exploited her by means of false representations, causing her to suffer significant negative financial and personal consequences, including: (1) the loss of all her money and good credit, forcing her to file bankruptcy and incur legal fees; and (2) emotional stress and hardship. In addition, the probation officer provided information from the FBI that after Mr. Zaler fled to Israel in 2008, he attempted to negotiate a deal with an Israeli Supersol grocery chain for hot dogs, was borrowing money related to that

_____

[2] While Mr. Zaler did not object to the probation officer's Guidelines calculations, other than to the loss calculation, he did object to the assessment Mr. Smith acted out of friendship, as discussed hereafter.

endeavor, had a civil suit pending against him, and returned to the United States only because he knew he was facing a number of problems in Israel.

The probation officer also pointed out: (1) Mr. Zaler left the country without permission while on bond and remained a fugitive for more than ten months before voluntarily returning from Israel to the United States; (2) he began the instant schemes less than two years after being discharged from parole in other fraud-related cases; (3) in the last fifteen years, he had committed several fraud schemes which have financially impacted or even devastated the lives of multiple individuals; (4) he previously received a total of fourteen and one-half years imprisonment for his prior fraud convictions but served only six years and eight months and failed to pay back most of the restitution due his prior victims; (5) his prior periods of incarceration and orders for restitution did not appear to serve as a sufficient deterrent as he continued to turn to crime to solve his business problems, including similar fraud schemes; (6) in committing his fraud schemes he acted deliberately, motivated by greed, and with no remorse, nor means or intention of paying the victims back; (7) his prior conduct indicated a high likelihood of recidivism; and (8) he failed to voluntarily seek and refused to accept treatment while incarcerated for his asserted bipolar disorder, resulting in a question as to whether his disorder should serve as a mitigating factor. Based on these factors, the probation officer recommended a sentence at the high end of the

-15-

government's "loss calculation" Guidelines range for a sentence of ninety-seven months on each count. The probation officer also recommended three years of supervised release on the wire and mail fraud counts and five years of supervised release on the bank fraud counts, all to run concurrently.

The only objection Mr. Zaler filed in response to the Guidelines calculation was to the loss calculation and resulting higher Guidelines range, arguing the probation officer incorrectly used the government's loss calculation instead of his. He also argued in favor of a variant sentence under the § 3553(a) sentencing factors, noting, in part: (1) his victims charged usurious interest rates on their loans; (2) he used the monies obtained to keep his businesses afloat and did not spend a significant amount of money on himself; (3) his actions and the absurdity of his schemes showed he was delusional and had an "untreated brain disorder"; and (4) Mr. Smith did not act out of friendship but benefitted from the schemes by receiving significant cash compensation for his assistance.

### E.  Sentencing

At the beginning of Mr. Zaler's sentencing hearing, the district court stated, "[t]he parties, [c]ounsel, are hereby advised, if I haven't notified you earlier, that I will not be imposing a sentence according to the Sentencing Guidelines, which are, as you know, advisory only; and I have considered them and will not be

-16-

following that advice." Then, again, after pointing out it had considered the

materials presented, including the presentence report and its attachments, it

stated, "[n]ow, as I've indicated, I'm not following the Sentencing Guidelines. I

am thoroughly familiar with the presentence report and the analysis of those

guidelines contained in that report." It then allowed the parties to provide

argument and Mr. Zaler an opportunity for allocution, during which Mr. Zaler

apologized for his actions and explained he committed the instant fraud, in part,

based on his ego and fear of failure.

In imposing his sentence, the district court provided the following

explanation for Mr. Zaler's fifteen-year sentence:

> The guideline calculations contained in the presentence report
> are correct; however, as directed by the Tenth Circuit Court of
> Appeals in the cases of *United States [v.] Huckins*[3] and *United States
> [v.] Munoz-Nava*,[4] I make the following findings:
>
> (1) The guidelines are not mandatory;
>
> (2) The facts have been provided by the probation officer and
> subjected to objection by both the prosecution and the defense;
>
> Aside from objections to matters of restitution, which I sustain
> and will comment upon later,[5] there are no objections having any

---

[3]  529 F.3d 1312 (10th Cir. 2008).

[4]  524 F.3d 1137 (10th Cir. 2008).

[5]  Contrary to the district court's statement, our review of the record shows
(continued...)

effect on my consideration of the appropriate sentence to be imposed.

Both parties have been advised that the ... sentences will not be guideline sentences, and both parties have been given full opportunity to argue their positions as to condign sentences.

....

I find the application of the guidelines produces sentences less than necessary to achieve the purposes of Title 18 [U.S.C. §] 3553(a). They fail to take into full consideration the multiple repetitions of the defendant committing various kinds of fraud following punishment and arrest.

I find the defendant is a hard-core recidivist and that sentences of lesser time imposed on him in the past have utterly failed to prevent him from committing further crimes involving fraud and deception. At his present age of sixty, there is no reason based on his record to believe that he will ever cease committing crimes of this nature. Those crimes deserve punishment and deterrent sentences in excess of those recommended by the guidelines.

Perhaps more to the point, the defendant has previously been sentenced to [fourteen and one-half] years for felonies but served less than half of that time in prison and yet recidivated again and again. I think a greater sentence is thus called for.

The public needs to be protected from further crimes of this defendant, and I think the only hope for such protection is that he be imprisoned until such times as he is too old to offend again.

For almost a two-year period after having served prison sentences and parole supervision, this defendant obtained moneys

---

[5](...continued)
Mr. Zaler did not object to the recommended restitution amount of $2,664,573.22 contained in the presentence report, which the parties agreed in the plea agreement was the amount of restitution due victims. However, as later discussed, the district court reduced the amount of restitution below the amount recommended in the presentence report and as agreed to by the parties, which neither party disputes on appeal.

-18-

and business loans through fraud and deceit, causing more than $2 million in loss to the parties named in the indictment. Other parties, some far less able to bear the brunt of his criminality, suffered as well.

The defendant created fraudulent documents and enlisted the aid and complicity of a younger man [Mr. Smith] whose life is now in tatters as a result.

The defendant states he intended to repay the victims involved and that he used his ill gotten gains to benefit his struggling businesses. That is a tale that is told more often than not by fraudsters, and it means nothing. The path to hell is paved with such good intentions.

The defendant believes that his crimes may have been caused at least in part by bipolar disorder. If that is, indeed, the case–and the diagnosis is not entirely credible–it is equally true that [he] refused to take medication that would have significantly, if not entirely, reduced his symptoms. It seems he is suggesting ... that because he didn't like the effects of the medications, others should suffer.

The final factor relating to the defendant's persistent criminal conduct is that he left the United States in violation of his bond, lied to others about where he was, and even then as a fugitive attempted to resume his practice of cheating and deceiving others.

From age forty-five to the present, this defendant's acts are the very tissue of lies and deceit. What is perhaps most troubling of all is that many of the victims he sought are those who, by their affinity to the same proud culture and belie[f]s, were most eager to give him a helping hand. In addition to being criminal, these acts are shameful.

I am acutely aware of the awesome finality of sentencing a man of sixty to prison; but in this case, the safety of the community, the ability of people to be free of his predations, clearly outweighs any claim for compassion.

The district court then imposed fifteen-year sentences for each count, to be served

concurrently, and concurrent terms of supervised release for five years on the bank fraud counts and three years on the wire and mail fraud counts.

It also imposed restitution and, in so doing, stated a difference existed between the determination of loss for the purposes of restitution and for loss calculations under the Guidelines–the latter of which requires only a reasonable estimate of loss and may be based on the greater of the intended or actual loss. It then explained "[t]hough I will not engage in a lengthy discussion of the guidelines, it is quite possible that a different calculation would result were I to consider the intended loss inflicted upon your victims." It then imposed a total order of restitution of $2,479,946.87.[6]

At the conclusion of the sentencing hearing, Mr. Zaler's attorney objected to the fifteen-year sentences on grounds the district court failed to sufficiently address his Guidelines objections or otherwise set out sufficient factors to justify the sentence. In response, the district court explained:

I think that I addressed the fact that the guidelines are not being

---

[6] This amount included $152,235.75 to MEP Group; $1,921,073.22 to Spivak Funding; $142,500 to Donald Skupsky; and $264,137.90 to Kroenke. As to the amount of restitution due to Mr. Perlmutter, the district court determined Mr. Zaler's fraudulent conduct was not a direct or proximate cause for his decision to make loans to him, resulting in no order of restitution for the amount of loss he incurred.

applied in this case. And hence, the objections as to conformity with the guidelines ... have no bearing at all upon my sentence. And the reason which I gave and which I adhere to in this case is, as I have found, that the guidelines do not sufficiently take into consideration the repeated recidivist activities of this defendant.

## II. Discussion

### A. Arguments on Appeal

On appeal, Mr. Zaler contends his sentences are both procedurally and substantively unreasonable. Mr. Zaler claims the district court committed procedural error in three ways. First, he claims it failed to specifically calculate the Guidelines, which the presentence report estimated ranged anywhere from sixty-three to 115 months, depending on different variations of Guidelines calculations, including the upward departure, and, instead, the district court merely stated, "the guideline calculations in the [presentence report] were correct." Next, he suggests the district court failed to consider the mandatory sentencing factors in 18 U.S.C. § 3553(a)(4) and (6)[7] because it failed to calculate his applicable Guidelines offense level and criminal history category or consider

_____

[7] Section 3553(a)(4) provides that in imposing a sentence sufficient, but not greater than necessary, to comply with the purposes of the sentencing factors, the district court shall consider "the kinds of sentence and the sentencing range established for ... the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines ...." Similarly, § 3553(a)(6) states the district court shall consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct ...."

the need to avoid unwarranted sentence disparities with other similarly-situated defendants. Finally, he claims the district court failed to adequately explain the chosen sentence, particularly in light of its substantial deviation from the Guidelines range and certain Guidelines which already took into account the "ordinary" circumstances on which the district court relied to impose a variant sentence. He contends none of these procedural errors are harmless given they affected the district court's selection of the sentences imposed.

As to the substantive reasonableness of his fifteen-year sentences, Mr. Zaler claims they are substantively unreasonable: (1) in view of the totality of the information before the district court and the reasons articulated by it; and (2) because they are nearly double the top of the highest Guidelines range set forth in the plea agreement and requested by the government. More specifically, he claims the district court failed to explain why Mr. Zaler's situation was different or meaningfully distinct from the circumstances already covered by the Guidelines calculations or the probation officer's recommendation that an upward departure would more accurately represent the seriousness of his criminal history and his potential to re-offend.

### B. Standard of Review and Legal Principles

We review sentences for reasonableness, giving deference to the district

court under an abuse of discretion standard. *See United States v. Smart*, 518 F.3d 800, 802, 805-06 (10th Cir. 2008). Thus, we review "'all sentences–whether inside, just outside, or significantly outside the Guidelines range–under a deferential abuse-of-discretion standard,'" in which we "afford substantial deference to the district courts." *Id.* at 806 (quoting *Gall v. United States*, 552 U.S. 38, 41 (2007)). The district court abuses its discretion if the resulting sentence is "arbitrary, capricious, whimsical, or manifestly unreasonable." *Huckins*, 529 F.3d at 1317 (internal quotation marks omitted).

"Our appellate review for reasonableness includes both a procedural component ... as well as a substantive component, which relates to the length of the resulting sentence." *Smart,* 518 F.3d at 803. "Procedural reasonableness addresses whether the district court incorrectly calculated or failed to calculate the Guidelines sentence, treated the Guidelines as mandatory, failed to consider the § 3553(a) factors,[8] relied on clearly erroneous facts, or failed to adequately explain the sentence." *Huckins*, 529 F.3d at 1317. In determining whether the district court properly calculated a sentence, we review its legal conclusions de

---

[8] The § 3553(a) factors include not only "the nature of the offense" but the history and "characteristics of the defendant, as well as the need for the sentence to reflect the seriousness of the crime, to provide adequate deterrence, to protect the public, and to provide the defendant with needed training or treatment ...." *United States v. Kristl*, 437 F.3d 1050, 1053 (10th Cir. 2006) (*per curiam*); *see* 18 U.S.C. § 3553(a).

novo and its factual findings for clear error.  *See Kristl*, 437 F.3d at 1054.

In turn, "[a] challenge to the sufficiency of the § 3553(a) justifications relied on by the district court implicates the substantive reasonableness of the resulting sentence." *Smart*, 518 F.3d at 804.  Stated another way, "substantive reasonableness addresses whether the length of the sentence is reasonable given all the circumstances of the case in light of the factors set forth in 18 U.S.C. § 3553(a)." *Huckins*, 529 F.3d at 1317 (internal quotation marks omitted).  In assuring the district court has considered the § 3553(a) factors before imposing a sentence, we have said it must "state in open court the reasons for its imposition of the particular sentence" and satisfy us that it "has considered the parties' arguments and has a reasoned basis for exercising [its] own legal decisionmaking authority." *Rita v. United States*, 551 U.S. 338, 356 (2007).  Further, if the sentence is within the correctly-calculated Guidelines range, we may apply a rebuttable presumption of reasonableness to the sentence.  *See Kristl*, 437 F.3d at 1053-55.

However, a sentence falling outside the Guidelines range, like the one at issue here, is not entitled to a presumption of reasonableness, nor is it presumed to be unreasonable.  *Huckins*, 529 F.3d at 1317.  Instead, district courts may, in their discretion, conclude a non-Guidelines sentence best serves the purpose of

the § 3553(a) sentencing factors but "must provide reasoning sufficient to support the chosen variance," *Smart*, 518 F.3d at 807, including "a specific reason for deviating from the Guidelines," *Huckins*, 529 F.3d at 1317 (internal quotation marks omitted). As a result, "a district [court] must give serious consideration to the extent of any departure from the Guidelines and must explain [its] conclusion that an unusually lenient or an unusually harsh sentence is appropriate in a particular case with sufficient justifications." *Id.* "An adequate explanation of the chosen sentence allows for meaningful appellate review and promotes the perception of fair sentencing." *Id.*

While the district court must provide an adequate explanation for a variance, "[w]e may not examine the weight a district court assigns to various § 3553(a) factors, and its ultimate assessment of the balance between them, as a legal conclusion to be reviewed de novo," and, instead, "we must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance." *Smart,* 518 F.3d at 808. In making its assessment of the sentencing factors, "[i]t is well established that the sentencing court is entitled to rely on uncontested facts contained in the [presentence report] for certain sentencing purposes," including to draw conclusions about the nature of the offense and history and characteristics of the defendant relevant to the sentencing factors in 18 U.S.C. § 3553(a). *United States v. Mateo*, 471 F.3d

1162, 1166-67 (10th Cir. 2006).

As to the degree of any variance, the district court need not adhere to "a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence" nor "necessarily provide 'extraordinary' facts to justify *any* statutorily permissible sentencing variance, even one as large as [a] 100% variance ...." *Smart*, 518 F.3d at 807 (internal quotation marks omitted). "Although the degree of variance from the Guidelines range remains a *consideration* on appeal, ... it may not define our threshold standard of review." *Id.* In the same vein, we do not require the district court to "distinguish the defendant's characteristics and history from those of the ordinary offender contemplated by the Guidelines" when imposing a variance, nor do we require the "existence of extraordinary defendant characteristics and history." *Id.* at 808. While the Guidelines "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives" and provide a "measure of national practice to use as a starting point," we recognize the district court has "greater familiarity with the individual case and the individual defendant" for the purpose of imposing a variance. *Id.* Finally, as we instructed in *Smart*:

> In many cases, the Guidelines recommendation and the district court's individualized determination will continue to overlap, but we may not assume that the Guidelines perfectly express the § 3553(a)

factors present in an individual case in the face of a district court's conclusion to the contrary.

We may not conclude that simply by diverging from the Guidelines, a district court has disregarded the policy considerations which led the Commission to create a particular Guideline .... If district courts are required to balance the Guidelines against the other § 3553(a) considerations, then we cannot say they disregard the Guidelines simply by striking a different balance and imposing a variance in a particular case.

*Id.* at 809.

C.  Procedural Reasonableness

Applying these principles, we begin with Mr. Zaler's argument his sentence

is procedurally unreasonable because the district court failed to correctly

calculate the Guidelines or apply the recommended upward departure, as required

by the Guidelines themselves or under 18 U.S.C. § 3553(a)(4)(A).  As

demonstrated by the record, Mr. Zaler did not object to any portion of the

Guidelines calculation in the presentence report except to dispute the

government's § 2B1.1(b)(1) loss calculation.  When the district court stated the

Guidelines calculations were correct, it was patently aware of the dispute over the

loss calculation and the resulting two sentencing ranges based on the parties'

different loss calculations.  Thus, its assessment of the correctness of the

Guidelines calculations pertained to all but the two different loss calculations in

dispute by the parties, which it concluded made no difference in its decision to

impose non-Guidelines sentences based on its determination that application of the Guidelines would produce sentences less than necessary to achieve the purposes of 18 U.S.C. § 3553(a). As a result, it is evident it rejected even the highest calculation of the sentencing ranges as well as the probation officer's recommendation for an upward departure. It also indicated it was "quite possible" the loss calculation would be more than its restitution determination of $2,479,946.87, further demonstrating application of the higher loss calculation would not affect its decision to impose non-Guidelines sentences. Accordingly, regardless of which loss calculation and resulting sentencing range applied, or if an upward departure was applied, it is clear the district court concluded such Guidelines calculations produced sentences "less than necessary to achieve the purposes of Title 18 [U.S.C. §] 3553(a)."

To the extent the district court erred in failing to make an express determination as to which loss calculation applied or by failing to explicitly state why the recommended upward departure would provide insufficient punishment, the error is harmless. This is because it is clear the result (*i.e.*, its imposition of fifteen-year sentences) would be the same, regardless of which loss calculation the district court considered accurate or if it explicitly rejected the recommended upward departure. In other words, a remand merely for the purpose of having the district court explain which of the two loss calculations and resulting sentencing

ranges is correct, or why an upward departure would be insufficient, would not result in it imposing a lesser sentence.

We next address Mr. Zaler's contention the district court committed procedural error in failing to consider the need to avoid unwarranted sentence disparities with other similarly-situated defendants, as required by § 3553(a)(6). As previously discussed, we no longer require a district court to distinguish the defendant's characteristics and history from those of the ordinary offender contemplated by the Guidelines when imposing a variance, nor do we require facts demonstrating the existence of extraordinary defendant characteristics and history. *See Smart*, 518 F.3d at 806-08 (overturning *United States v. Garcia-Lara*, 499 F.3d 1133 (10th Cir. 2007)). Here, the record shows the district court considered the Guidelines calculations, which are the starting point for calculating sentences for similarly-situated defendants committing the same offense, but determined, based on its greater familiarity with Mr. Zaler and the aggravating circumstances, that a variance was warranted beyond the advisory Guidelines ranges for the reasons it provided. As a result, we discern no procedural error in its failing to explicitly distinguish Mr. Zaler's case from others.

Finally, Mr. Zaler claims the district court committed procedural error by

failing to adequately explain the chosen sentence, particularly in light of its substantial deviation from the Guidelines range and because it failed to explain why the Guidelines did not already take into account the circumstances in his case. In claiming the Guidelines addressed the circumstances presented, he claims: (1) the recommended one-level upward departure for under-representation of his criminal history category took into account his recidivist activities; (2) the sixteen- to eighteen-level increase under § 2B1.1(b)(1) for the loss calculation took into account the over \$2,000,000 loss he caused his victims; (3) the two-level increase under § 3B1.1(c) for his role in the offense took into account his enlistment of another person, Mr. Smith, in the commission of his fraud; and (4) the two-level increase under § 3C1.1 for obstruction of justice took into account the fact he left the United States while on bond.

As previously noted, we require district courts to "provide reasoning sufficient to support the chosen variance," *Smart*, 518 F.3d at 807, including "a specific reason for deviating from the Guidelines." *Huckins*, 529 F.3d at 1317. Here, the district court set out a straight-forward and specific reason as to why it decided to deviate from the Guidelines when it concluded their application would produce sentences less than necessary to achieve the purposes of 18 U.S.C. § 3553(a) because they failed to take into full consideration Mr. Zaler's "hard-core" recidivism in which he repeatedly committed various kinds of fraud

following his previous punishments for similar conduct, and the fact those previous punishments "utterly failed" to prevent his committing crimes involving the same fraud and deception. In providing further explanation in support of its determination, the district court pointed out Mr. Zaler was "sentenced to [fourteen and one-half] years for felonies but served less than half of that time in prison," and still "recidivated again and again." It further explained the public needed to be protected from Mr. Zaler's further crimes and stated its belief, based on the record, that he would never "cease committing crimes of this nature" and "the only hope for such protection" was his imprisonment "until such time as he is too old to offend again." It also discussed other factors supporting a variance, such as the fact his fraudulent schemes occurred within two years after his incarceration and parole supervision for similar conduct; the devastating financial and personal consequences Mr. Zaler caused his girlfriend and Mr. Smith; his refusal to seek treatment or take medication to reduce his alleged bipolar disorder, which he had previously used as an excuse for prior fraudulent conduct for which he was incarcerated; the resumption of his fraud while a fugitive in Israel; and his disingenuous reason for voluntarily returning to the United States. As a consequence, we perceive no error in the district court's specific reasons or explanation for the variance imposed.

While Mr. Zaler contends the Guidelines took into account the aggravating

circumstances on which the district court relied in applying a variance, the district court provided sufficient information in its explanation for us to understand why it determined they did not. For instance, while U.S.S.G. § 2B1.1(b)(1) took into account the two different monetary loss calculations caused by Mr. Zaler, the district court also pointed out he caused these losses after only a two-year period following his incarceration and parole supervision and imposed suffering on other victims far less able to bear the brunt of his criminality, as indicated by the harm he caused to his girlfriend and Mr. Smith. Clearly, it determined § 2B1.1(b)(1) did not fully take into account these aggravating circumstances. Similarly, while the Guidelines recommendations took into account Mr. Zaler's role in the offense under § 3B1.1(c) for being an organizer, leader, manager, or supervisor in the criminal activity, the district court indicated they did not take into account Mr. Zaler's complicity in causing Mr. Smith's "life [to be] in tatters." While Mr. Zaler received a two-level increase in his offense level for obstruction of justice under § 3C1.1, the district court noted he not only fled the country and lied to his probation officer about where he was, but incredibly attempted to resume his practice of cheating and deceiving others even while a fugitive in Israel. The presentence report also indicated he was a fugitive for an extensive period of ten months and only voluntarily returned to the United States because he was facing possible criminal charges in Israel. Again, it is clear the district court determined the Guidelines did not take into account such aggravating circumstances.

Most importantly, it is clear the district court determined the Guidelines, including the calculation of his criminal history and the probation officer's recommendation of an upward departure for the under-representation of his criminal history, did not adequately take into account his extensive or "hard-core" recidivism which prior punishments in the form of incarceration and restitution orders did not halt or even stymie. Instead, as the district court thoroughly explained, Mr. Zaler zealously and unabashedly continued to defraud various individuals and entities in fraud schemes similar to those he previously committed and for which he received punishment. Thus, while the Guidelines recommendations and the district court's individualized determinations may have had some overlap, we may not assume the Guidelines perfectly expressed the § 3553(a) factors present in Mr. Zaler's case in the face of the district court's conclusions to the contrary. Moreover, as previously noted, the error, if any, in the district court failing to explain in more detail why the Guidelines did not take these aggravating circumstances into account is harmless. Again, nothing in the record suggests the district court would have imposed a lesser sentence had it engaged in a more extensive discussion of the applicable Guidelines and its reasoning as to why they produced sentences "less than necessary to achieve the purposes of Title 18 [U.S.C. §] 3553(a)."

D.  Substantive Reasonableness

As to the substantive reasonableness of his fifteen-year sentences, Mr. Zaler claims they are substantively unreasonable in view of the totality of the information before the district court and the reasons articulated by it and because they are nearly double the top of the highest Guidelines range set forth in the plea agreement and requested by the government.  In support, Mr. Zaler again claims the district court failed to explain why his situation was different or meaningfully distinct from the "ordinary" circumstances covered by the Guidelines calculations or why the probation officer's recommendation of an upward departure would not accurately represent the seriousness of his criminal history and his potential to re-offend.

Despite Mr. Zaler's arguments to the contrary, we conclude his sentences are not substantively unreasonable in light of the sentencing factors in § 3553(a). As previously noted, the district court determined application of the Guidelines would produce sentences less than necessary to achieve the purposes of 18 U.S.C. § 3553(a) because they failed to take into full consideration Mr. Zaler's extensive recidivism in which he perpetrated multiple fraud schemes following previous punishments for similar conduct.  It also discussed other aggravating factors which it believed also warranted a variance, as previously discussed. As a result of these factors, it determined fifteen-year sentences would best achieve the

purposes of the § 3553(a) sentencing factors, including protecting the public from Mr. Zaler's recidivist activities.  Under our deferential standard of review, we may not examine the weight the district court assigned these § 3553(a) factors or its ultimate assessment of the balance between the § 3553(a) factors, but, instead, we give due deference to its decision, as made here, that the § 3553(a) factors, on a whole, justify the extent of the variance.  *See Smart,* 518 F.3d at 808.

Similarly, as discussed in our procedural reasonableness discussion, the district court did consider the Guidelines and determined the Guidelines did not adequately take into account certain aggravating circumstances, including, but not limited to, the extensive degree of Mr. Zaler's recidivism issues; the fact he perpetrated his nefarious schemes within two years following incarceration and parole supervision for similar conduct; the negative financial and personal consequences Mr. Zaler caused his girlfriend and Mr. Smith; Mr. Zaler's refusal to seek treatment or take medication to reduce his alleged his bipolar disorder; resumption of his fraud while a fugitive in Israel; and his disingenuous reason for voluntarily returning to the United States.  In addition, we repeat for clarity's sake that the district court was not required to distinguish Mr. Zaler's characteristics and history from those of the ordinary offender contemplated by the Guidelines when imposing the variance.  *Smart*, 518 F.3d at 808.  Instead, it could rely on the uncontested facts contained in the presentence report to make its

own conclusions concerning the nature of the offense and Mr. Zaler's characteristics relevant to the sentencing factors in 18 U.S.C. § 3553(a). *See Mateo*, 471 F.3d at 1166-67.

As to Mr. Zaler's complaint his sentences are double the advisory Guidelines sentences, the district court was not required to use a mathematical formula, including a percentage calculation, to determine the variance, nor provide extraordinary facts to justify the statutorily permissible sentence imposed. As we have said, the degree of variance from the Guidelines range remains a consideration on appeal but cannot define our threshold standard of review. While the non-Guidelines variant sentences imposed in this case were substantially more than the recommended advisory Guidelines sentences, they were within the statutory limit for such crimes, of which Mr. Zaler was advised, and produced sentences which the district court determined best reflected the purposes of the § 3553(a) sentencing factors, including the seriousness of Mr. Zaler's criminal history, his recidivism or potential to re-offend, and the need to protect the public. Applying our deferential standard of review to the circumstances presented, we conclude the district court did not abuse its discretion in imposing fifteen-year sentences, as the lengths of the sentences imposed are not "arbitrary, capricious, whimsical, or manifestly unreasonable." *Huckins*, 529 F.3d at 1317. As a result, we conclude Mr. Zaler's sentences are

substantively reasonable.


### III. Conclusion

For the foregoing reasons, we **AFFIRM** Mr. Zaler's sentences on appeal.


**Entered by the Court:**

**WADE BRORBY**
United States Circuit Judge